IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 15, 2013

**TERRI ANN KELLY v. WILLARD REED KELLY**

**Appeal from the Circuit Court for Hamilton County**
**No. 11D2052     Jacqueline S. Bolton, Judge**

_____

**No. E2012-02219-COA-R3-CV-FILED-AUGUST 6, 2013**
_____

CHARLES D. SUSANO, JR., P.J., concurring in part and dissenting in part.

I agree with the majority that the evidence in this case preponderates against the trial court's division of the net marital estate. I also concur in the majority's further conclusion that the evidence preponderates against the type and amount of alimony awarded to Ms. Kelly. In my judgment, the evidence preponderates in favor of the majority's division of the net estate and its award of transitional alimony in the amounts stated in the opinion.

I write separately to express my very strong disagreement with the majority's decision reversing the trial court's judgment designating Ms. Kelly as the primary residential parent of the parties' minor son. With all due respect to my colleagues, I find nothing in the majority opinion reflecting that the trial court abused its discretion when it approved a parenting plan placing both of the parties' minor children with Wife in Chattanooga. Obviously, the focus of the issue with respect to residential parenting is on the minor son, Will, as Mr. Kelly does not challenge the continued placement of his daughter with Ms. Kelly.

The majority cites a portion of the trial court's memorandum opinion dealing with custody. I prefer to quote all of the trial court's remarks:

> As to the most important issue before the Court, that involves Will. Though it is apparently conceded that Ann will remain with the Mother as her primary residential parent, the issue of Will is unsettled. Pursuant to T.C.A. §36-6-106 et. seq., the Court has listened to the reasonable preference of Will in determining this issue. The Court must make this determination of custody on the basis of the best interest of the child. The Court has considered the

following relevant factors: 1. The love, affection and emotional ties existing between the parents and the child; 2. The disposition of the parties to provide for the child with food, clothing, medical care, education, other necessary care, the degree to which a parent has been the primary caregiver; 3. The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; 4. The home, school and community record of the child; 5. The reasonable preference of the child; 6. Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each parent to facilitate and encourage a close and continuing parent child relationship between the child and both of the parents consistent with the best interest of the child.

Perhaps the last factor is one of the most important in this case. The Court is very concerned that upon learning that his Wife was to take the children and return back to Chattanooga with them, following several years of marital upheaval, it was Father's position that the Mother had blind-sided him with the divorce. He swept in to keep Will in Richmond. The Court finds that the Father has not been as attentive as he should have been to make sure in this transitional year for Will that he did his homework and studied. The Court finds that the Father did not put his son's best interest first, in that he was more of a buddy to his son than a Father. He did not make the hard choices to disallow Will from social activities when his grades was not good. He did not apparently take seriously the "pranks" which the school deemed "severe". Will was not further disciplined by his Father other than what the school did for inappropriate behavior. Father lacked judgment in some of his responses to his son. The Court finds that the Father lacks the parenting skills necessary to understand the delicate state of a 15 year old boy whose parents have gone through a very difficult time, as well as the entire family.

The Court further finds it is in the best interest of Will that he remain in the same home with his sibling, Ann, who is just two years younger than he and to whom he opined looks up to him and mimics him. The Court further finds that the Mother has a large network of family here in Chattanooga to nurture and support Will and that it is the paramount best interest of Will that he be returned to Chattanooga to be reunited with his Mother and sister and the extended family. There is proof in the record that Will would be considered for placement at his sister's school, Boyd Buchanan, which the Court finds is an excellent placement for Will.

I now turn to the brief filed on behalf of Ms. Kelly. There is evidence in the record, which, if believed, supports the following statements in the brief:

Will Kelly was fifteen (15) years old at the time of the trial. Except for the short period of time during the divorce when Will Kelly lived with Mr. Kelly in Brentwood, Tennessee, Ms. Kelly had always served as the primary caretaker of Will Kelly. Ms. Kelly had taken Will Kelly to almost every doctor and dentist appointment including the Learning Lab for testing where Will Kelly was diagnosed with a learning difference after kindergarten. However, under Ms. Kelly's care, Will Kelly had always done well in school including when he lived in Charlotte and in Richmond. Ms. Kelly knew best how to handle his educational needs for scheduling and guidance.

When Mr. Kelly moved to Richmond, Virginia and lived apart from the family, he rarely called the children. He did not come home during the week for any of the children's activities. Ms. Kelly, on the other hand, was highly involved in their school as a room mother and also in their church groups. She never employed any assistance with the children.

Ms. Kelly made all the arrangements for moving the children to Richmond and continued to be the primary caretaker of the children there. When Mr. and Ms. Kelly separated in Richmond, the children continued to live with Ms. Kelly.

When Ms. Kelly decided to move to Chattanooga with the children, and they had been accepted to a private schools there, Mr. Kelly took Will Kelly and concealed him from Ms. Kelly. Mr. Kelly did not permit Ms. Kelly to see Will Kelly for a couple of days. Will Kelly became upset. He didn't want to leave his school in Richmond. Mr. Kelly told Will Kelly that he would die if he did not have him in his life. Ms. Kelly then left Richmond without Will Kelly. Mr. Kelly's decision to keep Will Kelly with him in Richmond, Virginia cost him his job.

Mr. Kelly moved to Brentwood, Tennessee with Will Kelly and chose a public high school for him. In Brentwood, Will Kelly's grades included numerous low C's and D's. On his final exams in May, Will Kelly made two (2) B's, two (2) C's, and two (2) F's. Will Kelly's teachers were concerned about Will Kelly's failure to complete homework assignments.

Janet Wulff, Will Kelly's school counselor at Brentwood High School was concerned about Will Kelly. She had observed a change in his personality and behavior during his (9th) grade year. Will Kelly had become friends with students who had reputations for being less academically oriented, and for being bullies. Will Kelly was making poor choices in his activities and in his behavior. Will Kelly had to serve an in-school suspension. Mr. Kelly did not inform Ms. Kelly about the severity of Will Kelly's disciplinary problems.

On or around May 9, 2012, Will Kelly violated school policy by making lewd comments about two (2) students. Will Kelly was reprimanded. Janet Wulff believed that Will Kelly needed more supervision and stability.

Mr. Kelly had established a home environment for Will Kelly that lacked appropriate parental supervision. The four thousand (4,000) plus square foot home with four (4) bedrooms, four (4) bathrooms, and Will Kelly's recreation room was a "male man cave." Mr. Kelly had involved Mr. Heath, a twenty-nine (29) year-old Christian youth organizer, who led a group of about thirty (30) young men who were always getting in trouble for various pranks. Mr. Heath, and an associate of his, used Mr. Kelly's home to host meetings every other week. Mr. Kelly had participated in the meetings, providing drinks, games, and a "parent-free environment to a certain extent" for the young men.

Mr. Heath did not know of any unusual discipline problems or any inappropriate behavior towards women. Mr. Heath testified that he did not feel it was his place to reprimand the group for sexist comments or lewd behavior. Mr. Heath testified that the fifteen-year-old boys would say some really raunchy things. He felt they were just trying to be funny. Mr. Heath did not have kids. His main concern was that Will Kelly knows about Jesus.

Ms. Kelly had established a place for Will Kelly in Chattanooga which was better suited for his needs. She had moved to a house near her mother, father, brother, sister-in-law, and Will Kelly's cousins. Will and his sister, Ann Kelly, needed be together. It was an area which offered the best public schools, and she had obtained a house with three (3) bedrooms. Will Kelly had also been accepted to a private school there and his grandfather had offered assistance to Ms. Kelly to help pay Will

Kelly's tuition to a private school. Will Kelly's grandfather and grandmother were eager to assist Ms. Kelly.

Although Will Kelly testified that he did not want to leave Brentwood, it was evident to the Trial Court that his preference was not reasonable. The Trial Court did not abuse its discretion in rejecting the preference of a fifteen-year-old boy to remain in an essentially parent-free man-cave under the guidance of a twenty-nine (29) year old counselor and a father who was away at work for nine (9) or ten (10) hours every day. And, although Will Kelly wanted to stay at Brentwood High School, it was unclear if Mr. Kelly would be able to keep him there.

The Trial Court correctly applied a best interest analysis under Tenn. Code Ann. § 36-6-106(a) in making its custody determination with regard to Will Kelly. It is in the best interest of Will Kelly that Ms. Kelly is designated as the primary residential parent in Hamilton County, Tennessee. The Trial Court did not abuse its discretion.

Against all of this, the majority focuses on three things: (1) that Ms. Wulff, the counselor at Will's high school, who testified regarding his bad grades and misdeeds at the school, is not credible because she had "a clear bias" reflected in her statement that she was – in the words of the majority – " 'a proponent' of children going with their mothers"; (2) the parties' son, Will, gave "unequivocal testimony that he wishes to remain in Nashville" with his father; and (3) the trial court's reference, as criticized by the majority, to Mr. Kelly "sw[eeping] in to keep Will" when he learned that Ms. Kelly was intending to move with both children from Richmond to Chattanooga.

The majority concludes that, since Ms. Wulff testified by phone, the majority was "free to make [its] own credibility determination as to" her testimony. I agree that, when a witness testifies by way of a *non-video deposition*, *or affidavit*, an appellate court is free to assess credibility anew. In such a case, neither the trial court nor the appellate court, observes or hears the testimony. That is not exactly what we are dealing with in this case. Here, the trial court had the advantage of *hearing* the witness. What was the tone of her voice? What about the inflection in her voice? Did she sound calm and sure or was she argumentative in her approach? Did she sound as if she was unbiased or did she sound like an advocate? Furthermore, the main portion of her testimony was about bad grades and egregious conduct at school, about which there doesn't appear to be a great deal of dispute. I also do not believe her factual testimony should be discarded because she believes minor children should be with their mother. I suppose, but obviously do not know for sure, that many

people, both men and women, feel the same way. This "bias" alone does not mean that a witness has been untruthful.

As to the second point – Will's desire to stay with his father – this point is not, under the circumstances of this case, very meaningful. A young man Will's age could be expected to side with a father who does not seem to discipline when appropriate, is frequently away from the home in connection with his employment, and apparently does not fully understand his son's history of bad grades and inappropriate conduct.

Finally, as to the trial court's criticism of the father's "swooping in to keep Will," that criticism, it seems to me, is appropriate when one expresses the conduct in a somewhat different, but also correct, way: father stepped in and prevented these siblings from being parented in the same residence.

One last thought. Even assuming the validity of these three points, I do not believe that they alone can justify a finding that the evidence preponderates against the trial court's custody determination. Again, on this issue, I find no abuse of discretion on the part of the trial court.

In the final analysis, the trial court's decision effects a reuniting of siblings, who are undisputably close, in the household of their primary caregiver for most of their lives – a mother against whom, and with respect to whose parenting skills, nary a negative word can be found in the record.

I concur in part and respectfully dissent in part.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE